UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ROBERT GESSLING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:07-cv-0483-DFH-DML |
| | ) |
| GROUP LONG TERM DISABILITY PLAN | ) |
| FOR EMPLOYEES OF SPRINT/UNITED | ) |
| MANAGEMENT COMPANY, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON THE MERITS

Plaintiff Robert Gessling has sued defendant Group Long Term Disability
Plan for Employees of Sprint/United Management Company alleging that the plan
administrator abused its discretion in terminating his long-term disability
benefits, violating the Employee Retirement Income Security Act of 1974 (ERISA),
29 U.S.C. § 1001 *et seq.*  The administrator – Hartford Life – initially granted
benefits to Gessling but later terminated them after conducting surveillance of
Gessling and reviewing its medical consultants' opinions that Gessling was not
disabled.  After the Supreme Court decided *Metropolitan Life Ins. Co. v. Glenn*,
554 U.S. —, 128 S. Ct. 2343 (2008), the court denied both parties' motions for
summary judgment to give them an opportunity to discover and present additional
evidence on Hartford Life's conflict of interest so that it could be compared to the
conflict that Metropolitan Life faced in *Glenn*.  The plan administrator had

discretion to interpret and administer the plan.  It decided whether to pay or deny benefits.  Decisions to deny benefits had the direct effect of leaving money in its pocket, as the administrator.  The parties have presented that evidence, and Gessling has renewed his motion for summary judgment.  The court finds that the conflict-of-interest evidence shows no unusual aggravating or mitigating factors, though the conflict itself remains a factor in the analysis.  The case is ripe for a final decision on the merits based on the administrative record and the additional evidence submitted by the parties.

Even under the deferential standard that applies to the administrator's decision, the termination of Gessling's benefits was arbitrary and capricious. Hartford Life unreasonably discounted Gessling's treating physician's and his own assessments of his pain and limitations.  The reliance on the surveillance did not rationally support the decision to terminate benefits, and Hartford Life's consulting doctors did not provide a reasoned basis for discounting the evidence from Gessling and his treating physician showing he had been struggling with severe and disabling pain.  The court orders that the benefits be reinstated for the remaining months of the two-year "own occupation" benefit period, and remands Gessling's case to Hartford Life for a fresh look at whether he qualified for benefits beyond that time into the "any occupation" benefit period.  The court reaches this decision without relying on the conflict of interest issue under *Metropolitan Life v. Glenn* and the evidence presented concerning it.

I.    *The Standard of Review*

The employee benefit plan here gave Hartford Life "full discretion" to determine eligibility for benefits and to interpret the plan's terms.  R. 31.  That plan provision is sufficient to require the court to review the denial of benefits under the deferential "arbitrary and capricious" standard.  See *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989); *Gutta v. Standard Select Trust Ins. Plans*, 530 F.3d 614, 619 (7th Cir. 2008); *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321 (7th Cir. 2007).  The court addresses the conflict of interest evidence in Part IV of this entry.

II.    *Facts from Administrative Record*

Plaintiff Robert Gessling began working for Sprint/United Management Company ("Sprint") in December 1998 as an account executive.  He was responsible for managing national accounts.  He spent about half of his time working in an office and half of his time out of the office with customers.  R. 137.  He often drove to customer locations but had the option of flying if needed.

According to his supervisor, Gessling's duties required frequent walking and repetitive hand motions, occasional standing and sitting, and minimal lifting and carrying.  R. 824.  Gessling spent about fifteen percent of each workday in written communication and about ten percent of each workday driving.  He worked forty

hours per week, managed himself, scheduled his own meetings, and had flexibility in creating his travel schedule.  R. 137, 820.

In May 2002, Gessling was involved in a traffic accident.  While his car was at a standstill, a semi-tractor trailer traveling about forty miles per hour hit his car from behind.  R. 776.  The impact caused significant damage to Gessling's car, but Gessling himself did not seem injured immediately after the accident.  The person who towed Gessling's car dropped him off at home.  His wife later took him to a hospital because he was complaining of pain in his neck, right shoulder, arm, and lower back.  R. 668.  The record does not include any documentation of that first hospital visit after the accident.  His neck pain continued.  On August 16, 2002, Dr. Dan Nordmann saw Gessling and reviewed an MRI taken on June 13, 2002.  The MRI revealed bony outgrowths and inflammation in and around Gessling's third, fourth, fifth, and sixth cervical vertebrae.  R. 776.  Dr. Nordmann injected lidocaine into the right side of Gessling's second, third, fourth, fifth, and sixth cervical vertebrae.  R. 777.  Almost immediately after the injections, Gessling reported complete pain relief.  In September 2002, Dr. Judith Dunipace injected steroids in the nerve roots on the right side of Gessling's fifth cervical vertebra.  R. 797.  The record does not include any medical evidence between September 2002 and February 2005.

Gessling worked for more than two years, through February 15, 2005, but he then took disability leave.  R. 820.  He saw his primary physician, Dr. John

Walker, on February 16, 2005.  R. 726.  Dr. Walker noted that Gessling suffered from chronic neck pain and anxiety, and he ordered another MRI.  The new MRI revealed several areas of degeneration since the June 13, 2002 MRI:  (1) broad-based disc bulges and disc herniation, bone spurs, associated moderate stenosis, and foraminal narrowing at the fifth and sixth cervical vertebrae; (2) bone spurs and mild stenosis at the third, fourth, and fifth cervical vertebrae; (3) mild broad-based disc bulges at the sixth and seventh cervical vertebrae; and (4) mild disc herniation at the seventh cervical vertebrae and the first thoracic vertebrae.  R. 576-77.  Dr. Timothy Divens interpreted these changes as mild spondylosis of the lower cervical spine.  R. 659.

On February 18, 2005, Gessling applied for disability benefits from Sprint, attaching an evaluation from Dr. Walker reporting diagnoses of "cervical spine pain with foraminal stenosis, disc herniation, spondylosis," and headaches.  R. 825-26.  Gessling received short-term disability benefits from February to August 2005 from Hartford Life and Accident Insurance Company (Hartford Life), which insured Sprint's employees and managed their claims for disability benefits.  R. 48-50, 712.

The long-term disability insurance policy required an employee to demonstrate a disability for an elimination period (six months for Gessling) before he became eligible for long-term disability benefits.  R. 21, 32, 830.  After the elimination period, the employee could qualify for long-term disability benefits for

up to two years if the disability prevented him from performing one or more of the essential duties of his own occupation.  R. 32.  After this two year period, the employee could qualify for continued long-term disability benefits only if the disability prevented him from performing one or more of the essential duties of *any* occupation.  *Id.*

After looking at the February 2005 MRI in April 2005, Dr. Dunipace characterized Gessling's bone spurs as "fairly significant."  R. 653.  Because of Gessling's continuing pain, Dr. Dunipace recommended further treatment of the fifth and sixth cervical vertebrae.  R. 654.  On May 6, 2005, Dr. Dunipace injected lidocaine into the right side of Gessling's fourth, fifth, and sixth cervical vertebrae.  R. 651-52.  The injections significantly reduced Gessling's neck pain.  On June 7, 2005, Dr. Dunipace burned the nerve roots in a procedure called a rhizotomy on the right side of Gessling's fourth, fifth, and sixth cervical vertebrae.  R. 648-49.  In July 2005, Gessling reported that he had "gotten excellent pain relief" from these blocks in his lower neck but that he was still experiencing pain in his upper neck.  On August 26, 2005, Dr. Dunipace injected lidocaine into the right side of Gessling's second, third, and fourth cervical vertebrae.   R. 736-37.   On September 12, 2005, she injected lidocaine and an anti-inflammatory into Gessling's fifth cervical vertebra.  R. 774.  The injections reduced but did not eliminate the upper neck pain.  R. 775.  On September 13, 2005, Dr. Dunipace burned the nerve roots on the right sides of Gessling's second, third, and fourth vertebrae.  R. 734-35.

On September 23, 2005, Dr. Walker – the primary care physician – saw Gessling and reported that he was still experiencing chronic neck pain as well as insomnia.  R. 724.  In a "Functional Assessment Tool" sent to Hartford Life, Dr. Walker opined that Gessling was not capable of performing full-time work and that he was "limited by pain in all activities at present."  R. 723.  In November 2005, Hartford Life approved Gessling for long-term disability benefits as of August 16, 2005.  R. 364-65.

In early February 2006, Gessling began seeing acupuncturist Tony Brenner. R. 679-82.  He described the treatment as helpful but told Brenner that it provided only temporary relief.  R. 677.  On February 7, 2006, Dr. Walker reported that Gessling was still experiencing chronic pain, headaches, and depression.  R. 662.

In late February and early March 2006, Hartford Life hired private investigators to put Gessling under surveillance.   In thirty-five hours of observation over four days, the investigators saw Gessling engaged in very limited physical activity for a total of about eight and a half minutes.  R. 152-53.  On the first day, Gessling drove to a church and a car wash.  At the car wash, Gessling got out of his car and wiped dry the edges of his car doors and the back bumper. R. 155-56.  On the second day, Gessling walked out to his mailbox and was seen riding in a car as a passenger.  R. 158.  On the third day, the investigators did not see Gessling at all.  R. 158-60.  On the fourth day, Gessling went to a convenience

store to get a drink, took his daughter to a dental appointment and then to a restaurant on the way back to her school, and he then stopped by a business called Life Alternatives before returning home.  R. 161-62.

Life Alternatives, Inc. was listed with the Indiana Secretary of State's office as a for-profit corporation in Indianapolis incorporated in July 2004.  R. 589.  The company apparently operated as an outpatient substance abuse clinic.  Gessling owned one-third of Life Alternatives.  He resigned as the corporation's registered agent in February 2006.  He continued to receive minimal distributions from the company.  R. 132.

In the wake of the surveillance, on April 10, 2006, Gessling met with a Hartford Life investigator at a public library to discuss his application for long-term disability benefits.  During the interview, he reported having "severe neck pain that feels like a hot burning poker in my neck and the pain radiates down through my shoulder."  He also reported having chronic depression, headaches, insomnia, and fatigue.  R. 127.  Gessling used a home traction device three times a week, attended a pain support group once a month, and applied ice and heat to his neck about once a month.   In addition to performing the acupuncture, Brenner hypnotized Gessling to help manage his pain.  R. 128.

At the meeting with the investigator, Gessling described significant restrictions due to his pain: he could walk for about ten minutes before

experiencing significant pain; he could stand for ten to twenty minutes before experiencing significant pain; he could sit for two hours continuously before having to stretch; he could lift and carry items weighing up to five pounds without experiencing a burning sensation in his spinal area; he had reduced range of motion in his lower back and neck and could not reach over his head without experiencing significant pain; and he could not repeatedly walk up and down flights of stairs without aggravating his neck pain.  R. 128-30.  He could drive for about an hour if he was well rested.  R. 130.  Gessling also reported that when he experienced significant pain, he had difficulty balancing, focusing his eyes, and concentrating.

Gessling signed a written statement affirming his oral statement to the investigator.  R. 133.  The investigator then informed Gessling of the surveillance conducted in late February and early March.  He asked Gessling to sign a statement accepting Hartford Life's summary of the surveillance as true.  R. 134.  Gessling "stated he felt the surveillance video vindicated him," but he refused to sign the second statement without first speaking to his attorney.  R. 179.  The investigator reported that during the interview Gessling "did not display any cognitive difficulties even though the claimant stated his current pain level was seven."  R. 180.

In April 2006, Hartford Life obtained a copy of an independent medical evaluation that Dr. Neil Levine had completed in July 2005 for a suit Gessling had

brought against the trucking company involved in the 2002 accident.  R. 667.  Dr.
Levine reported that as of July 2005, the rhizotomy had reduced Gessling's level
of neck pain from significant to moderate.   Dr. Levine opined that some of
Gessling's spinal degeneration predated the 2002 accident, and he noted that
Gessling had undergone lower back surgery in 1993.  He concluded that Gessling
had an overall 16 percent permanent impairment, placing him in the American
Medical Association's "Cervical Category III."    R. 671-72, citing Linda
Cocchiarella & Gunnar B.J. Andersson, Am. Med. Ass'n, Guides to the Evaluation
of Permanent Impairment 418-21, Tables 15-12, 13, 14 (5th ed. 2001).

In May 2006, Hartford Life sent Dr. Walker a copy of the video surveillance
and Gessling's April 10, 2006 statement for him to review.  Hartford Life indicated
that unless Dr. Walker found otherwise, Hartford Life would find that Gessling
could work full-time.  R. 637.  On May 24, 2006, Dr. Walker found otherwise.  He
reported that Gessling's:

> clinical depression has overtly worsened since his In-person interview with
> your company representative.  His abilities are significantly limited by
> ongoing pain from his neck.  It is true that he has forced his way through
> pain to maintain his responsibilities as a father, which you apparently
> document in your video (i.e. taking his child to preschool).  However, I can't
> imagine six minutes of video being enough to reasonably satisfy a critical
> examiner as to his functional abilities.
>
> His pain has continued, as has his disability.

R. 635.

On June 15, 2006, at Hartford Life's request, Dr. Marcos Iglesias reviewed Gessling's medical files.  He did not examine or talk with Gessling.  Dr. Iglesias concluded that Gessling was able to work full-time without restrictions or limitations.  R. 630.  Dr. Iglesias based his conclusion on the surveillance video and noted that Gessling's "neck and shoulder complaints are subjective and there are no objective findings to corroborate them."  R. 629.  He found it difficult to assess how depression, anxiety, and insomnia affected Gessling because the record contained little information about Dr. Walker's diagnoses.  R. 630.  On June 29, 2006, Hartford Life notified Gessling that it found he was no longer disabled and was terminating his long-term disability benefits.  R. 355-59.

On August 28, 2006, Dr. Divens ordered another MRI and compared it to Gessling's February 2005 MRI.  Dr. Divens observed "some mild progression of disc herniation" and increased stenosis at Gessling's fifth and sixth cervical vertebrae.  R. 549-50.  On September 8, 2006, in a long-term disability claim form, Dr. Walker opined that Gessling's conditions still prevented him from performing one or more of the essential duties of his occupation as an account executive with Sprint.  R. 581-82.  On September 18, 2006, Gessling had surgery to remove a benign tumor on his right shoulder.  R. 552.  He reported having no pain in the areas that the rhizotomies covered, but he felt a moderate amount of pain in other areas, which increased significantly with movement.  R. 560.

In October 2006, Gessling appealed Hartford Life's decision to terminate his long-term disability benefits, and he submitted his latest medical records as evidence of a continuing disability.   R. 544-47.   Hartford Life arranged to have neurologist Dr. Robert Marks and psychiatrist Dr. Maureen Smith review his medical files.   They also did not examine or talk with Gessling.   Like Dr. Iglesias before them, Dr. Marks and Dr. Smith determined that Gessling did not have any mental or physical limitations that would prevent him from working in his position as an account executive.   R. 380, 388.   Dr. Walker reported to Dr. Marks and Dr. Smith that Gessling's irritability, poor concentration, and sleep disturbance "definitely impair his higher functions needed to perform his job to his potential." R. 457.   Those impairments alone did not disable him, but the combination of the emotional and mental disorders and his chronic pain disabled him, according to Dr. Walker.   *Id.*

On January 25, 2007, Hartford Life affirmed its decision to terminate Gessling's long-term disability benefits.   R. 342-46.   Gessling filed suit in state court, and the defense removed the case to this court.   This court has jurisdiction pursuant to 28 U.S.C. § 1331.

The terms of the employee benefit plan give administrator Hartford Life "full discretion" to determine eligibility for benefits and to interpret the plan's terms. R. 31.   Hartford Life is not merely an administrator but pays benefits out of its

own pocket.  In other words, a decision to grant or deny benefits has a direct effect on Hartford Life itself.  Additional facts are noted as needed.

III.    *Hartford Life's Decision to Terminate Benefits*

The issue is whether Hartford Life's decision to terminate benefits was arbitrary or capricious.  A plaintiff challenging an administrator's decision to terminate benefits under this standard often tries to show that the administrator simply failed to exercise judgment or used unreasonable judgment.  See, *e.g.*, *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774-75 (7th Cir. 2003) (reversing summary judgment for administrator under the abuse of discretion standard where "there is an absence of reasoning in the record to support" the termination of benefits); *Hess v. Hartford Life & Accident Insurance Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (affirming judgment for plaintiff under abuse of discretion standard where "the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious"); *Herzberger v. Standard Insurance Co.*, 205 F.3d 327, 329 (7th Cir. 2000) (reversing summary judgment for administrators in consolidated cases where district court erroneously applied the abuse of discretion standard, and observing that a court can set aside a discretionary judgment only if it was an abuse of discretion, "that is, unreasonable, and not merely incorrect").

Gessling's issues with Hartford Life's denial here fall within the "failure to exercise judgment" and "reasonableness of the judgment exercised" categories. In its June 29, 2006, letter, Hartford Life informed Gessling that it terminated his disability benefits for three reasons:  (1) the surveillance and in-person interview demonstrated that Gessling was more active and alert than he had reported possible; (2) Gessling's association with Life Alternatives; and (3) Dr. Iglesias' conclusion that Gessling was able to work full-time without restrictions or limitations.  R. 222.  In October 2006, Gessling provided copies of his tax return to Hartford Life showing that he received only minimal distributions from Life Alternatives.  R. 544, 591.  In its January 25, 2007, letter, Hartford Life affirmed its decision to terminate Gessling's benefits based on the surveillance and Dr. Marks' and Dr. Smith's additional medical record reviews.  R. 345.

The surveillance and interview observations do not provide reasonable, objective support for Hartford Life's decision.  The surveillance video shows Gessling engaged in less than nine minutes of minimal movement over the course of four days of observation.  The investigators recorded Gessling walking to and from his car, bending over once, running a few errands, and gently wiping parts of his car dry after an automated car wash.  Those observations were not inconsistent with Gessling's alleged limitations.  See generally *Scott v. Harris*, 550 U.S. 372, 380 (2007) (relying on video recording to resolve factual dispute: when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for the purpose of ruling on a motion for summary judgment"); *Hawkins v. First Union Corporation Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003) (reversing summary judgment for administrator under abuse of discretion standard and observing that a "desperate person might force himself to work despite an illness that everyone agreed was totally disabling").[1]

Similarly, Gessling's ability to answer basic questions about himself and the pain he was experiencing during a brief interview does not demonstrate objectively that he was able to consistently engage in the sustained critical thinking necessary to work as a sales account executive.  See generally *Hawkins*, 326 F.3d at 919 ("That individuals with chronic pain benefit when their lives have purpose and meaning is certainly a sensible suggestion, but . . . striving for purpose and meaning may explain why Hawkins may be exerting himself beyond his capacity, paradoxical as 'working beyond capacity' may seem.").

---

[1]Defendant's reliance on *Mote v. Aetna Life Insurance Co.*, 502 F.3d 601 (7th Cir. 2007), is not persuasive.   *Mote* affirmed summary judgment for the administrator where video surveillance showed the plaintiff running errands, driving to medical appointments, and loading groceries into her car.  *Id.* at 605. The question in *Mote*, however, was whether the plaintiff could work in any occupation, which "differs significantly from the more lenient 'own occupation' definition" at issue here.  *Id.* at 607.  The video surveillance of Gessling may have shown that he was capable of driving for a little longer than the fifteen minutes he reported to a Hartford Life representative in August 2005, see R. 136, but it says nothing useful about his ability to work in his own occupation.

What is left are the dueling opinions of Gessling's treating physician Dr. Walker, who repeatedly opined that Gessling was disabled from performing the duties of his own occupation, and of three doctors Hartford Life hired who never examined Gessling but who each concluded that he could perform the duties of his own occupation.  Under ERISA, treating physicians' opinions are not entitled to more deference than the opinions of physicians that the administrator hired.  See *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833-34 (2003).  At the same time, however, administrators may not arbitrarily "refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Id.* at 834.

The MRIs here show that Gessling suffers from degenerative disc disease that appears to have been worsening with time.  See R. 549-50, 576-77, 776 (showing increased stenosis and disc herniation from 2002 to 2006).  He has gained some some permanent relief from the rhizotomies Dr. Dunipace performed in June and September 2005 to five out of his seven cervical vertebrae.  In April 2006, according to Gessling, he was still experiencing severe pain in his neck and right shoulder.  R. 127.  He had surgery on his right shoulder in September 2006 to remove a benign tumor.  The record contains notes from a follow-up the day after the surgery, R. 558, 560, but nothing detailing how the surgery has affected Gessling's overall level of pain since recovery.  The MRIs objectively show conditions requiring significant limitations, but the question is whether the

rhizotomies and shoulder surgery dulled Gessling's pain to the point that he could perform the duties of his own occupation.

It is difficult, of course, for anyone but the subject to determine the subject's level of pain because of the unavailability of objective medical tests for pain. To manage this difficult problem in the Social Security context, courts have looked to other indicia of the patient's credibility and to the accuracy and consistency of the administrative law judge's analysis. See, *e.g.*, *Sarchet v. Chater*, 78 F.3d 305, 307-08 (7th Cir. 1996) (reversing denial of benefits because the ALJ made a number of errors in evaluating the claimant's testimony). Here, Hartford Life and the doctors it hired unreasonably relied on the surveillance of and the in-person interview with Gessling to discount his credibility.

In *Hawkins*, the Seventh Circuit faced similar facts. See 326 F.3d 914. The claimant had fibromyalgia, akin to neck and back pain in its clinical elusiveness. The administrator had argued that the plaintiff's level of activity was inconsistent with his claim of disability. The *Hawkins* court rejected this argument, noting that the plaintiff's "unfortunate choice in life is between succumbing to his pain and fatigue and becoming inert, on the one hand, and on the other hand pushing himself to engage in a certain amount of painful and fatiguing activity." *Id.* at 918. The latter efforts did not prove that the plaintiff could work. Nevertheless, the administrator's medical consultant opined that the plaintiff could work because he was able to undergo pool therapy and other basic activities. Finding that the

consultant's assessment provided "nothing more than scraps" to offset the plaintiff's evidence, the *Hawkins* court found that the administrator had abused its discretion in denying the plaintiff's application for disability benefits. *Id.* at 919.

Here, Hartford Life unreasonably discounted Gessling's assessment of his pain and limitations. The surveillance was essentially a bust, yet Hartford Life relied upon it heavily to justify its original decision to terminate benefits. The interview of Gessling at the public library also did not provide substantial evidence that could support a conclusion that he was able to return to work full-time as a national account executive. The reviewing physicians never examined Gessling, and they simply had no reliable way to evaluate Gessling's account of his pain and his limitations, or the corroboration from Dr. Walker, who had treated Gessling over a long period of time and was familiar with his limitations. Dr. Iglesias and Dr. Marks both relied heavily on the surveillance in reaching their own conclusions, but their review adds no weight to the results of the surveillance.

Dr. Iglesias relied on the surveillance and the medical records, and he ultimately disagreed with Dr. Walker's opinion of disability because of "the lack of objective evidence of dysfunction and the documented normal use and range of motion of his neck, low back and right upper extremity." R. 630. Dr. Iglesias found no limitations of any kind for full-time work. *Id.* The opinion based only on records was conclusory, see *Hackett*, 315 F.3d at 775 (finding termination of

disability benefits was arbitrary and capricious where it was based on conclusory opinion of doctor who actually examined claimant), and did not come to grips with the long history of Gessling's pain treatment and complaints or with Dr. Walker's opinion that Gessling is not a malingerer.  See *Hawkins*, 326 F.3d at 918-19 (finding termination of disability benefits was arbitrary and capricious where based upon opinion of physician who only reviewed records and overemphasized difference between subjective and objective evidence of pain).  The reliance on a few minutes of the many hours of surveillance failed to address the real issue of the ability to work on a full-time basis.

Dr. Marks reviewed the medical records.  He recognized that Gessling had degenerative changes of the spine and conceded only that they "may provide some discomfort."  R. 379.  He added:  "However, there are individuals with similar changes who are able to carry out the activities at the level of the claimant's occupation."  The Seventh Circuit has sharply criticized such reasoning based on other patients.  See *Hawkins*, 326 F.3d at 918-19 (finding termination of disability benefits was arbitrary and capricious; reviewing physician's comment that "the majority of individuals with fibromyalgia are able to work" was "the weakest possible evidence" that plaintiff himself could actually work).  Although Dr. Marks (unlike Dr. Iglesias) recognized that there might be some limitations for Gessling (not working at heights, for example), he also did not come to grips with the subjective evidence of pain, including the Gessling's medical history and the opinion of Dr. Walker.

Dr. Smith reviewed the psychiatric record and received answers to written questions from Dr. Walker and from the acupuncturist. She recognized mild mental and emotional symptoms that were secondary to Gessling's complaints of pain. R. 387. She concluded there was "no evidence to support restrictions and limitations from the mental/emotional point of view from 7/1/2006 and beyond." R. 388. The separate opinions of Dr. Marks and Dr. Smith failed to address Dr. Walker's key point: that it was the *combination* of the physical and mental problems that disabled Gessling. Dr. Marks focused on the physical evidence and Dr. Smith on the mental and emotional evidence. Each concluded that each separate category of evidence did not support a claim of disability. Their separate analyses simply did not address the whole problem, and Hartford Life's reliance on them was therefore arbitrary and capricious.

The record here also shows that Gessling aggressively pursued for several years a range of therapies for his pain, including the rhizotomies, acupuncture, epidural injections, and even hypnosis. Those efforts are hard to reconcile with a theory that Gessling was exaggerating or lying about his pain. See *Diaz v. Prudential Ins. Co. of America*, 499 F.3d 640, 646 (7th Cir. 2007) (reversing summary judgment for plan under de novo review; efforts at therapy supported credibility of claimant's complaints of pain); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (remanding denial of Social Security disability benefits based on subjective pain complaints where claimant had undergone extensive, varied, and intrusive pain therapies). At the very least, a mere record review is not

sufficient to provide a reasonable basis for discounting Dr. Walker's and Gessling's accounts of his pain and resulting limitations.

The court does not mean to suggest that it is reviving any requirement of special deference to a treating physician. Far from it. See *Nord*, 538 U.S. at 825 (holding that ERISA does not require plans to provide such deference). But to disagree with an apparently sound opinion of a treating physician, a plan administrator needs something much more solid than the consulting physicians provided in this case. See *id.* at 834 (reminding courts that plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physicians). The medical records did not show that Dr. Walker and Gessling must have been correct – the problems of subjective pain and resulting limitations are difficult to evaluate based on records alone. But after reviewing the records, the reviewing physicians failed to come to grips with the real problem, the whole person, and the history that corroborated his complaints of pain. For these reasons, the records reviews in this case did not provide a reasonable basis for denying the disability insurance benefits for which Gessling and his employer paid substantial premiums to Hartford Life.

IV.    *Hartford Life's Conflict of Interest*

The Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. —, 128 S. Ct. 2343 (2008), modified courts' review of most decisions denying ERISA benefits by plan administrators who have a financial stake in the decision to grant or deny benefits.   In *Glenn*, the Supreme Court held that an ERISA plan administrator has a conflict of interest when the administrator both determines eligibility and pays benefits.   128 S. Ct. at 2348.   The Court made clear that although that conflict will not alter the standard of review of ERISA cases, the conflict is a factor that should be taken into account by courts when determining whether a plan abused its discretion in deciding to deny benefits to a plan participant.   The Court explained that "conflicts are but one factor among many that a reviewing judge must take into account," and that "when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one.   This kind of review is no stranger to the judicial system.   Not only trust law, but also administrative law, can ask judges to determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together."   *Id.* at 2351.   Any one factor being considered:

> will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance.   The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.   It should

prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.* (internal citations omitted).

Before *Glenn*, the Seventh Circuit had presumed that plan administrators were neutral "unless a claimant shows by providing specific evidence of actual bias that there is a significant conflict."  *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 575 (7th Cir. 2006), quoting *Kobs v. United Wisconsin Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005).  In the wake of *Glenn*, the Seventh Circuit has addressed the more specific question of how much weight courts should give this inherent conflict of interest as they consider the various factors influencing claims decisions in any given case.  In *Marrs v. Motorola, Inc.*, 577 F.3d 783, 788 (7th Cir. 2009), the court quoted the passage from *Glenn* set forth above and explained:

> There are two ways to read the majority opinion.  One, which tracks its language and has been echoed in opinions in this and other circuits, makes the existence of a conflict of interest one factor out of many in determining reasonableness.  That sounds like a balancing test in which unweighted factors mysteriously are weighed.  Such a test is not conducive to providing guidance to courts or plan administrators.  "Multifactor tests with no weight assigned to any factor are bad enough from the standpoint of providing an objective basis for a judicial decision; multifactor tests when none of the factors is concrete are worse."  *Menard, Inc. v. Commissioner*, 560 F.3d 620, 622-23 (7th Cir. 2009) (citations omitted).

If that's the test the Supreme Court has adopted, we must bow.  But it is not clear that the rudderless balancing test suggested by the passage that we quoted was intended to be the last word on the standard that should guide decision in these cases.  The test can be made more directive, without contradicting the Court's opinion, by first recognizing that while a decision may *look* reasonable if one just reads the decision and the record, a decision that is "reasonable" rather than clearly correct is a decision that might just as well have gone the other way, as when "reasonable"is used, as it often is, to mean that a ruling was not an abuse of discretion.  If the circumstances indicate that probably the decision denying benefits was decisively influenced by the plan administrator's conflict of interest, it must be set aside, just as a decision by a judge who should have recused himself must be set aside even if he might well have reached the same decision had there been no basis for recusal.

The *likelihood* that the conflict of interest influenced the decision is therefore the decisive consideration, as seems implicit in the majority opinion's reference to indications of "procedural unreasonableness" in the plan administrator's handling of the claim in issue, and its suggestion that efforts by a administrator to minimize a conflict of interest would weigh in favor of upholding his decision.  It is thus not the existence of a conflict of interest – which is a given in almost all ERISA cases – but the *gravity* of the conflict, as inferred from the circumstances, that is critical.

*Id.* at 788-89 (internal citations omitted; emphasis in original).

A.    *Discovery of Information About the Conflict of Interest*

One side effect of *Glenn* has been that plaintiffs challenging a plan administrator's denial of benefits are entitled to reasonable discovery to explore these factors and evaluate the "gravity of the conflict."  See *Gessling v. Group Long Term Disability Plan for Employees of Sprint/United Mgmt. Co.*, 639 F. Supp. 2d 947, 948 (S.D. Ind. 2009) (Lynch, J.) (granting motion to compel production of evaluations for employees involved in reviewing plaintiff's claim); *Hughes v. CUNA Mut. Group*, 257 F.R.D. 176, 179 (S.D. Ind. 2009) (Stinson, J.) (granting motion to

compel); *Gessling v. Group Long Term Disab. Plan for Employees of Sprint/United Mgmt. Co.*, 2008 WL 5070434, at *1-2 (S.D. Ind. Nov. 26, 2008) (Hamilton, C.J.) (allowing discovery and ordering parties to confer on its scope); *Fischer v. Life Ins. Co. of N. Am.*, 2009 WL 734705, at *2-4, (S.D. Ind. Mar. 19, 2009) (Baker, J.) (granting motion to compel and collecting cases allowing limited discovery relevant to conflict of interest issue); *Hogan-Cross v. Metropolitan Life Ins. Co.*, 568 F. Supp. 2d 410, 415 (S.D.N.Y. 2008) (denying motion to reconsider order compelling discovery); cf. *Creasey v. Cigna Life Ins. Co. of N.Y.*, 255 F.R.D. 481, 482-83 (S.D. Ind. 2008) (Hussmann, J.) ( denying discovery until the plaintiff shows that the case is a "close one" for which the conflict-of-interest factor could be decisive).

In this case, plaintiff sought discovery and, over objections of Hartford Life, eventually obtained information relevant to the conflict of interest, including information about how the outside reviewing physicians and their companies were compensated by Hartford Life, the names and compensation of the Hartford Life employees who participated in denying Gessling's claim, Hartford Life's criteria for compensation and bonuses, and one employee's performance evaluation. The discovery was provided under an agreed protective order governing discovery. When Gessling renewed his motion for summary judgment, he also moved to unseal these categories of evidence that he had filed under seal in support of his motion. Hartford Life has objected, arguing that the documents deserve confidential treatment.

The protective order was necessary at the discovery stage, but the plaintiff has put this evidence before the court for use in making a decision in this case. When evidence is presented to a court for purposes of making a decision, there is a strong presumption of a right of public access to the evidence.  See, *e.g.*, *Baxter International, Inc. v. Abbott Laboratories*, 297 F.3d 544, 546-47 (7th Cir. 2002). There is no indication here of gratuitous filing of discovery materials for the primary purpose of undermining its confidentiality.  Hartford Life contends that the compensation information is confidential and that access to it would help its competitors and competitors of the outside review companies.  The court is not persuaded.  As the Seventh Circuit explained in *Baxter International*, "many litigants would like to keep confidential the salary they make, the injuries they suffered, or the price they agreed to pay under a contract, but when these things are vital to claims made in litigation they must be revealed."  297 F.3d at 547, citing *Union Oil Co. v. Leavell*, 220 F.3d 562, 567-68 (7th Cir. 2000).

There is no claim here that the information amounts to a genuine trade secret.  While trade secrets do not exhaust the types of information that might legitimately be protected, Hartford Life has not made the sort of showing needed to keep under seal the evidence the court has considered.  Several additional considerations are relevant here.  First, after *Glenn*, the institutional conflict of interest is an important feature of judicial review of ERISA benefit decisions. Second, this type of evidence will be relevant in a host of cases involving every significant player in the disability insurance business.  This type of information

will circulate publicly for all of them.  Third, ERISA regulations provide that plan participants and beneficiaries should have access to information that lets them evaluate the fairness of the plan.  See 29 C.F.R. §§ 2560.503-1(b)(5), (h)(2), (j)(3), (m)(8).[2]  Where a plan and a plan administrator enter into a contract that deliberately gives the plan administrator a conflict of interest, there is nothing unfair about requiring the parties involved to disclose information that will let the people most likely to be affected by the conflict to evaluate its effects on them. The court recognizes, of course, that it is not basing the decision in this case on the conflict-of-interest evidence, but that conclusion and the evidence it is based upon should both be matters of public record that other parties, lawyers, and courts should be able to evaluate, especially when federal courts are in the early years of applying *Metropolitan Life v. Glenn*.

---

[2]Subsection (h)(2)(iii) requires disability insurance plans to "Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits."   Subsection (m)(8) defines whether information is "relevant to a claim for benefits," and includes information that "Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination."   In turn, subsection (b)(5) requires claims procedures to "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents. . . ."  Finally, subsection (j)(3) requires plan administrators to notify claimants of their right to received these documents upon request and free of charge.   Thus, under the regulations, a plan participant or beneficiary is entitled to documents relevant to the plan's processes and safeguards – or the absence of such processes and safeguards – for ensuring compliance with the plan.   Documents relevant to the conflict of interest seem to fall within this definition.

Gessling has presented evidence demonstrating the nature and extent of Hartford Life's conflict of interest.  He argues that Hartford Life gave significant financial incentives to its employees and reviewing physicians, leading to a process that Gessling contends "more likely decreases accuracy, rather than promotes accuracy."  Dkt. No. 77 at 7.  He contends that claims examiners were not "walled off" from the financial interests of Hartford Life but instead were "rewarded based on their direct contributions to Hartford's bottom line."  *Id*.  He also raises findings by other courts in other districts that Hartford Life acted arbitrarily and capriciously in denying other claims.  Dkt. No. 78, Ex. 9 (collecting cases).

B.    *Reviewing Physicians*

Hartford Life did not contract directly with the outside reviewing physicians.  Instead, as is common, it contracted with medical review agencies that contracted with the physicians.  A review agency called UDC contracted with Dr. Marks and Dr. Smith.  Hartford Life paid UDC a total of $3.6 million in 2005, $2.5 million in 2006, and $1.3 million in 2007.  Dkt. No. 79, Ex. 2.  An agency called Medical Advisory Group contracted with Dr. Iglesias.  Hartford Life paid MAG $1.1 million in 2005, $1 million in 2006, and $610,000 in 2007.  Dkt. No. 79, Ex. 3.

Over the three years for which evidence has been presented, Dr. Marks performed 303 claim reviews for Hartford Life and was paid a total of $425,000 for

that work.  Dr. Iglesias performed 10 reviews for Hartford Life and was paid a little more than $8,000.  Dr. Smith, a psychologist, performed 133 claim reviews and was paid a little more than $133,000.  Dkt. No. 79, Ex. 1.  These dollar amounts, Gessling argues, "suggest that [the reviewing physicians] are not independent; rather, they have been provided a significant incentive to support Hartford in its endeavor to deny claims."  Dkt. No. 77 at 8.

The court cannot conclude, however, that, because Hartford Life paid UDC and MAG or the individual physicians for work they rendered, those entities and individuals acted out of bias.  There has been no showing that these entities or individual physicians had any underlying incentive to deny claims.  Money could be an incentive, as Gessling argues, but the record before the court demonstrates only that the review agencies and physicians performed services for Hartford Life and were paid accordingly.  It does not demonstrate that they were offered additional money or additional contracts to deny claims – in fact, Hartford Life paid UDC and MAG considerably less in 2007 than it did in 2005.  One would expect the opposite result if UDC and MAG had incentives to help Hartford deny claims that affected this decision in 2006.

The court infers only that these entities and physicians performed professional services and were compensated for their services.  Courts routinely note that when a plan administrator has an independent medical review by an outside expert, that fact weighs in favor of the plan administrator's decision.  See,

*e.g.*, *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998). Administrators must pay for those services.  It is not surprising that there is a substantial volume of the services or payments.  The court cannot assume a sinister motive from routine professional service transactions, which is all this record shows.  There is no evidence that the agencies or the physicians were "captives" of Hartford Life.

    C.    *Hartford Life Employees*

    Gessling further argues that Hartford Life's employee bonus programs, which were tied to Hartford Life's bottom line, discouraged employees from fairly adjudicating claims.  Dkt. No. 77 at 10, citing Dkt. No. 79, Ex. 5.  Specifically, Gessling points the court to Hartford Life's 2005 Compensation Overview, which described the bonus plans available to some Hartford Life employees.  Hartford Life's Long-Term Incentive Compensation Program was designed to "align the interests of employees with the interests of the Company's shareholders by basing a significant portion of total compensation upon shareholder value creation." *Id.* at 981.  Hartford Life also had an Incentive Stock Plan, again for the stated purpose of "align[ing] the interests of managers and employees with those of shareholders.  Granting stock options provides a tangible link with shareholder interest by creating an incentive to increase the market price of The Hartford's stock through improving Company performance."  *Id.* at 983.  In addition, Hartford Life offered a Business Performance Award and Individual Performance

Award to eligible employees, which gave those employees "the opportunity to participate in the success of the company and to also recognize employees who have consistently demonstrated exceptional performance.  Funding for the Plan is based on an annual business results compared to performance measures."  *Id.* at 986.  With these incentives, Gessling argues, Hartford Life "creates an environment that promotes biased claims decisions."  Dkt. No. 77 at 11.

More specifically, Gessling contends that compensation paid to the Hartford Life employees who processed his claim demonstrates that those employees were biased.  Gessling's claim was denied in June 2006.  In April of that year, one employee who processed his claim received a salary increase and then in June received a second raise of six percent.  Based on his 2006 performance, the same employee received a Business Performance Award of five percent of his annual pay and an Individual Performance Award of about 2.5 percent.  Another employee received a salary increase in April 2006, and based on his 2006 performance, he received a Business Performance Award of five percent and an Individual Performance Award of six percent.  Another employee was awarded a raise on April 1, 2006, and based on her 2006 performance she received a five percent Business Performance Award and an Individual Performance Award of about twelve percent.  Dkt. No. 79, Ex. 6.

With this evidence, Gessling has demonstrated that Hartford Life paid its employees a salary and that it paid them bonuses that were tied to the overall

stock price of the company and its affiliates.  He has demonstrated that the individual employees who considered and denied *his* claim were paid a salary and received bonuses that were tied to Hartford Life's stock performance.  However, it is too great a leap to assume from Hartford Life's employee compensation package and structure that individual employees would – or did – deny claims because they thought that doing so would have a direct impact on their salaries or their bonuses.  In a company as huge as Hartford Life, the connection between the denial of an individual claim and the denying employee's pocket is simply too attenuated.   Again, the record before the court shows that payment was received for work performed – nothing more and nothing less.

Gessling also points to an undated page of a performance review of one employee stating that the employee, who was involved in Hartford Life's decision to terminate Gessling's benefits, "follows up with physicians aggressively to facilitate return to work opportunities.  In addition, he sets [return to work] expectations with her [sic] claimants early in the claim process." Dkt. No. 79, Ex. 7.  A single notation in one paragraph of one employee's performance evaluation is weak support for Gessling's general conclusion that the employee was biased in his claims processing.  The employee's ability to facilitate return-to-work "opportunities," even "aggressively," does not demonstrate that he was biased in administering claims.  In this case, it demonstrates at most only that he was doing his job.

D.     *Other Hartford Life Cases*

Gessling also provides a list of cases from around the country dating back to 1998 in which other courts have found that Hartford Life abused its discretion in denying particular claims.  This compilation has little value for the immediate question before the court, which is whether Hartford Life abused its discretion in its denial of *Gessling's* claim.  Hartford Life is a nationwide insurance company and a major corporation.  It is not at all surprising that some of its claim decisions have led to litigation and that in some of those cases it lost.  Surely in others, perhaps many others, it won and no abuse of discretion was found.  Gessling does not provide that list for comparison.  But whether Hartford Life's cases were won or lost, abuse of discretion is a fact-specific inquiry.  This court is concerned only with Gessling's claim and the context and circumstances of Hartford Life's denial as demonstrated by the administrative record in this case.  Without evidence of systematic bias like that cited in *Glenn*, see 128 S. Ct. at 2351, citing John H. Langbein, Trust Law as Regulatory Law: The UNUM/Provident Scandal and Judicial Review of Benefit Denials Under ERISA, 101 Northwestern  U. L. Rev. 1315, 1317-21 (2007),  the evidence that Hartford Life has been found to have abused its discretion toward a few other plaintiffs bringing other claims in other courts has little value.

Gessling admits that he has no "smoking gun" showing actual bias, such as an admission from a Hartford Life employee that employees were paid bonuses

to deny claims, or any showing that UDC or MAG and the outside reviewing physicians were influenced by Hartford Life's payments. Dkt. No. 88 at 7-8. He argues that *Glenn* does not require such evidence, and the court agrees. However, the court is not convinced that the evidence plaintiff has presented is sufficient to demonstrate that the inherent conflict of interest that existed in Hartford Life's claims processing was likely to have affected its administration of his claim. Based on the language of *Glenn* and *Marrs*, the court finds that although Hartford Life had a conflict of interest in its administration of Gessling's claim, that conflict was not so grave as to have unduly influenced its decision to deny Gessling's benefits. The court does not afford it significant weight in its analysis.

Hartford Life – like many ERISA disability plan administrators – is conflicted in that it has the power to deny claims for benefits and also a duty to pay benefits. But there is no evidence in the record to indicate that this conflict was significant enough to have rendered Hartford Life's motive improper in terminating Gessling's benefits. As discussed above, that decision was unreasonable on its merits, but the conflict factor is moored to the evaluation of the administrator's motive. See generally *Metropolitan Life v. Glenn*, 128 S. Ct. at 2351 (recognizing that the conflict will be more significant "where circumstances suggest a higher likelihood that it affected the benefits decision" and less significant "where the administrator has taken active steps to reduce potential bias and to promote accuracy"); *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1052 (7th Cir. 1987) ("The less likely it is that the trustees' judgment was impaired by their having a

stake, however indirect, in the outcome, the less inclined a reviewing court will be to override their judgment unless strongly convinced that they erred.").

*Conclusion*

Hartford Life's decision to terminate Gessling's disability benefits was arbitrary and capricious.   In many ERISA cases where plans have acted improperly to deny benefits, a remand for further consideration is the appropriate remedy, but where the plaintiff was actually receiving disability benefits that were improperly terminated, as they were here, the Seventh Circuit directs that the more appropriate remedy is reinstatement of benefits that were being paid before the improper denial.  See *Hackett*, 315 F.3d at 775-76 (reversing grant of summary judgment for plan and ordering reinstatement of benefits that were improperly terminated); see also *Halpin v. W. W. Grainger*, 962 F.2d 685, 967 (7th Cir. 1992) (affirming reinstatement of benefits that were improperly terminated).   "The distinction focuses on what is required in each case to fully remedy the defective procedures given the *status quo* prior to the denial or termination." *Hackett*, 315 F.3d at 776.   And here, as in *Hackett*, "the *status quo* prior to the defective procedure was the continuation of benefits.   Remedying the defective procedures requires a reinstatement of benefits." *Id.*, accord, *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 630 (7th Cir. 2005) (finding that where benefits had been terminated by improper procedures, the "appropriate remedy is an order

vacating the termination of her benefits" and directing the plan to "reinstate retroactively the benefits").

Accordingly, Gessling is entitled to retroactive payment of his benefits, with interest, for the remainder of the "own occupation" period, and the court remands the matter to the plan and its administrator to determine whether Gessling was disabled from working in "any occupation" within the meaning of the policy after the "own occupation" period expired.  **No later than March 30th** (14 days), the parties shall submit either one joint or two separate calculations of the principal and interest due as of March 31, 2010.  The court will then enter final judgment accordingly.

So ordered.

Date:  March 16, 2010

_____
DAVID F. HAMILTON, Circuit Judge*
*Sitting by designation

Copies to:

Elizabeth G. Doolin
CHITTENDEN MURDAY & NOVOTNY LLC
edoolin@cmn-law.com

Donald A. Murday
CHITTENDEN MURDAY & NOVOTNY LLC
dmurday@cmn-law.com

Bridget L. O'Ryan
O'RYAN LAW FIRM
boryan@oryanlawfirm.com

Stuart F. Primack
CHITTENDEN MURDAY & NOVOTNY LLC

sprimack@cmn-law.com

Amanda Lynn Yonally
O'RYAN LAW FIRM
ayonally@oryanlawfirm.com